UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELI LILLY AND COMPANY, | |
| Plaintiff, | |
| v. | Civil Action No. 24-3220 (DLF) |
| ROBERT F. KENNEDY, JR., Secretary of Health and Human Services et al., *et al.*, | |
| Defendants. | |
| BRISTOL MYERS SQUIBB COMPANY, | |
| Plaintiff, | |
| v. | Civil Action No. 24-3337 (DLF) |
| ROBERT F. KENNEDY, JR, Secretary of Health and Human Services et al., | |
| Defendants. | |
| NOVARTIS PHARMACUTICALS CORP, | |
| Plaintiff, | |
| v. | Civil Action No. 25-0117 (DLF) |
| ROBERT F. KENNEDY, JR, Secretary of Health and Human Services et al., | |
| Defendants. | |

**DEFENDANTS' REPLY IN FURTHER SUPPORT OF
THEIR CROSS MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Contents ........................................................................................................... i

Argument ......................................................................................................................... 1

   I.      Plaintiffs Misconstrue the 340B Statute. ............................................................ 1

   II.     The Agency's Decision to Decline to Approve Rebate Models "At this Time" Was Not Arbitrary and Capricious. ....................................................................... 4

         A.     The Agency's Position is Consistent with the Statute and Past Practices. .. 4

         B.     Plaintiffs Have Alternative Methods to Prevent Diversion and Duplication ............................................................................................................... 7

         C.     Plaintiffs Did Not Allow the Agency Sufficient Time to Consider the Effects of a Major Disruption to the 340B Program. ................................. 9

   III.    Bristol Myers and Novartis's Due Process Claims Lack Merit. ......................... 11

         A.     Plaintiffs' Have Not Identified a Constitutionally Protected Property Interest in Implementing Their Preferred Price Reduction Mechanism. .... 12

         B.     Novartis Had an Opportunity to Be Heard But Chose Not to Pursue It. .... 15

Conclusion ..................................................................................................................... 17

Defendants, the Secretary of Health and Human Services and the Administrator of the Health Resources and Services Administration respectfully submit this reply in further support of their motion for summary judgment.

## INTRODUCTION

In their reply and cross opposition, Plaintiffs Eli Lilly and Company ("Lilly"), Bristol Myers Squibb Company ("Bristol Myers"), and Novartis Pharmaceuticals Corporation ("Novartis") fail to advance arguments that would warrant denying Defendants' motion for summary judgment. The 340B Statute vests the Secretary of Health and Human Services, through the Health Resources and Services Administration ("the Agency") with discretion to provide for 340B price reductions through discounts or rebates. Thus, the Agency's position is in accordance with the law. Plaintiffs propose requiring covered entities to receive their 340B price reductions through rebates rather than the predominate direct discount system. Because of this change would disrupt the way that the 340B program has operated for more than thirty years the Agency's decision to neither "approve nor disapprove" the rebate models is not arbitrary and capricious. Finally, because Bristol Meyers and Novartis have not been deprived of a Constitutionally protected interest, their substantive and procedural due process claims fail.

## ARGUMENT

### I.    __Plaintiffs Misconstrue the 340B Statute.__

The ceiling price that a manufacturer must offer to a covered entity "takes into account any rebate or discount, as provided by the Secretary." 42 U.S.C. § 256b(a)(1). Plaintiffs asked the Court to rewrite the text of the statute in a way that would remove the Secretary from the process. See generally Lilly Mot, Bristol Mot. Novartis Mot. But in their opposition and reply, Plaintiffs backpedal. Plaintiffs now concede that the Secretary can "provide[ ]' for a rebate or discount model" but argue Secretary must specify the price reduction mechanism in the Pharmaceutical

Pricing Agreement. Opp'n at 12. But as the Agency explained, the pricing agreement is not a contract or a regulatory vehicle, rather, the pricing agreements "are uniform agreements that recite the responsibilities § 340B imposes, respectively, on drug manufacturers and the Secretary of [Health and Human Services]." *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 113 (2011). Plaintiffs attempt to disregard this precedent by arguing that the issue in *Astra USA* 563 U.S., at 113 was "whether 340B entities, though accorded no right to sue for overcharges under the statute itself, may nonetheless sue allegedly overcharging manufacturers as third-party beneficiaries of the [pricing agreement]to which the manufacturers subscribed." Opp'n at 13. But *Astra USA*, 563 U.S., at 114, held that the answer was no because "[i]f 340B entities may not sue under the statute, it would make scant sense to allow them to sue on a form contract implementing the statute, setting out terms identical to those contained in the statute." The pricing agreement and the statute are "one and the same." *Id.* Consistent with the Supreme Court's holding that the pricing agreement and the statute are "one and the same," the Agency could not amend pricing agreements for different manufacturer or covered entity types.

Accepting Plaintiffs' argument that the Secretary should create an individualized pricing agreement with each manufacturer specifying whether that manufacturer should offer rebates or discounts would not only contradict binding Supreme Court precedent would but would also contradict long-standing Agency practice. Each manufacturer that elects to participate in the 340B Program signs the same pricing agreement with the Secretary. AR 036-47. Indeed, when the Agency debuted the program on December 15, 1992, the Agency sent manufacturers copies of the agreement via certified mail and requested that manufacturers who wished to opt-in to the program sign and return the agreements to the Agency by January 6, 1993. 58 Fed. Reg. 27,289, 27,291 (May 7. 1993). Even though the pricing agreements were designed to be and have always been

form agreements, in creating the program, Congress anticipated that the Secretary would use whichever price reduction "mechanism that is the most effective and most efficient from the standpoint of each type of 'covered entity." H.R. Rep. No. 102-384, pt. 2, at 16 (1992).

Plaintiffs note that the Agency never preapproved the rebate models that have been used for 340B sales to AIDS Drug Assistance Programs. Pl. Mot at 14-15. But this assertion is only part of the story of how the Agency came to "recognize" a rebate option for AIDS Drug Assistance Programs. 63 Fed. Reg. 35,239 (Jun. 29, 1998). In recognizing the rebate system, the Agency stated,

> [a]lthough the discount system is functioning successfully for most covered entities, most [AIDS Drug Assistance Programs] have drug purchasing systems that have prevented their participation in the section 340B discount program. The use of a rebate option (in addition to the discount mechanism) should allow these groups to access section 340B pricing.

62 Fed. Reg. 45,823, 45,824 (Aug. 29, 1997).

In other words, the purchasing system that a type of covered entity, specifically the AIDS Drug Assistance Programs, used was preventing that type of covered entity from accessing the Program, and the Agency allowed rebates as a solution to this obstacle. In issuing this guidance, the Agency did not deny that it has the authority to block the rebate system or take enforcement action if the Agency was not convinced that the rebates would further the objectives of the 340B program. *Id.* Quite the opposite. In issuing this guidance the Agency reiterated that the Secretary would use the price reduction mechanism "that is the most effective and most efficient." *Id.* (quoting H.R. Rep. No. 102-384, pt. 2, at 16). Thus, the Agency's position that a manufacturer cannot unilaterally choose whether to offer 340B-priced drugs to covered entities through discounts or rebates without Secretarial input is not a "novel reading" of the 340B Statute. "The longstanding practice of the government—like any other interpretive aid—can inform [a court's]

determination of what the law is." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 386 (2024). Here, the Agency's longstanding practice has been to guard its prerogative to determine the most apt price reduction mechanism for a given type of covered entity. 62 Fed. Reg. at 45,824.

Accordingly, the Agency's decision to prevent Plaintiffs from unilaterally implementing rebate models was within the Agency's statutory authority.

## II. The Agency's Decision to Decline to Approve Rebate Models "At this Time" Was Not Arbitrary and Capricious.

Even though the Agency does not need to create individualized pricing agreements with each manufacturer, Plaintiffs could still engage with the Agency to obtain approval for a price reduction mechanism that balances all stakeholders' concerns. AR 292, 347, 439. Many of Plaintiffs' arguments that the Agency's decision was arbitrary and capricious rely on the premise that the Agency foreclosed them from implementing rebate models under any circumstances. See generally, Opp'n at 17-18. But this is not the Agency's position. As the Agency explained to each Plaintiff, the Agency could not "approve or disapprove" the rebate models "to date." AR 292, 347, 439. As Plaintiffs concede, the 340B program has been operating without the types of rebate models that Plaintiffs propose for more than thirty years and no manufacturer approached the Agency about large-scale adaptation of rebate models until July 2024. Opp'n at 21 n.3. But rather than collaborate with the Agency, Plaintiffs filed suit asking the Court to adopt a novel theory that the 340B Statute allows them to choose a price reduction mechanism regardless of what has been "provided by the Secretary." 42 U.S.C. § 256b(a)(1). See Lilly Compl. Bristol Meyers Compl. ¶ 96; Novartis Compl. ¶ 124.

### A. The Agency's Position is Consistent with the Statute and Past Practices.

Plaintiffs double down on their argument that the Agency's decision is arbitrary and capricious because the Agency did not treat its proposal like the AIDS Drug Assistance Program

rebates.  Opp'n at 16-17.  But Plaintiffs have no substantive answer for the distinctions between the rebate models used for the AIDS Drug Assistance Programs and the rebate models that they intend to implement, namely that the rebate models were permitted because the purchasing systems that many AIDS Drug Assistance Programs used made it difficult to access the 340B Program under a direct discount system.  62 Fed. Reg. at 45,824.  Here, there is no evidence that the current 340B price reduction systems are preventing covered entities from accessing the program.  "An agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so."  *Kreis v. Sec'y of Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2005).   Here, the Agency has provided a reason for treating the rebate models that Plaintiffs seek to implement differently from those used to effectuate price reductions for AIDS Drug Assistance Programs and thus Plaintiffs cannot rely on the Agency's treatment rebate models for AIDS Drug Assistance Programs as a basis to claim that the Agency's decision was arbitrary and capricious.  *Conta,* Opp'n at 16-17

Plaintiffs also ignore the distinctions between the rebate models and the product replenishment models.  Opp'n at 19.  Asking a covered entity to make one initial purchase at the wholesale cost and then make subsequent purchases at a discount is different than what Plaintiffs are asking of covered entities, namely, to make every purchase at the wholesale cost.  AR 203.  In its correspondence with Johnson & Johnson, another pharmaceutical manufacturer seeking to implement a rebate model, the Agency explained the differences between the replenishment model and the rebate models.  AR 203.  But the Court need not even accept the Agency's representations because Johnson & Johnson conceded that under the replenishment model, the covered entities make all but the first purchase at the 340B discounted price.  AR 060-61.  Additionally, the Agency does not "insist" on the product replenishment model, *Contra* Opp'n at 22, but unlike the rebate

models, the covered entities have voluntarily chosen to use the product replenishment process. AR 203. Plaintiffs notably do not claim that the covered entities forced them to participate in the product replenishment system against Plaintiffs' will, but Plaintiffs seek to force the covered entities to acquiesce to Plaintiffs' preferred system. *Id*.

The rebate models impose added financial burdens on the covered entities. Plaintiffs ask the covered entities to pay higher upfront costs which "reduces the hospitals' resources available for other patient care," and some covered entities may not have funds available to pay the higher upfront costs. AR 568. Plaintiffs claim that disproportionate share hospitals are "some of the largest, most sophisticated, and most profitable hospitals in the country," Opp'n at 18, but in reality, these hospitals provide sixty percent of uncompensated care. AR 568. And the disproportionate share hospitals that are eligible to participate in the 340B program are not for-profit businesses. To participate in the 340B Program as a covered entity, a disproportionate share hospital must be a state or local government entity or a non-profit corporation. 42 USC 256b(a)(4)(L). "For-profit hospitals aren't eligible to participate in the 340B Program." HRSA, Disproportionate Share Hospitals, https://www.hrsa.gov/opa/eligibility-and-registration/hospitals/disproportionate-share-hospitals, (last visited Apr. 3, 2025).

Plaintiffs argue that Congress did not intend for the Agency consider covered entities preferences in deciding the appropriate price reduction mechanism. Opp'n at 22-23. But Plaintiffs cite no authority for this argument and indeed, none exists, which makes sense because the covered entities are the beneficiaries of the 340B program. 42 U.S.C. § 256b(a)(1) (the pricing agreement "shall require that the manufacturer offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price . . .").  The purpose of the 340B Program was to help covered entities "stretch scarce federal resources as far as possible, reaching more eligible patients

and providing more comprehensive services." H.R. Rep. No. 102-384, pt. 2, at 12. If the Agency were to allow manufacturers to implement a price reduction mechanism that made it more difficult for the covered entities to stretch their resources, then the Agency would undermine a purpose of the Program. The Agency oversees the transactions between the manufacturers and the covered entities, and thus the Agency could not confine its consideration of proposed changes to the methods of effectuating price reductions to how the changes will affect the manufacturers. See generally, 42 U.S.C. § 256b(a)(1).

**B.    Plaintiffs Have Alternative Methods to Prevent Diversion and Duplication**

Plaintiffs minimize the availability of audits and the alternative dispute resolution process as tools to address their concerns regarding duplication and diversion. Opp'n at 23. However, it is not difficult for a manufacturer to establish the reasonable cause for duplication or diversion that will unlock the audit process. "Reasonable cause means that a reasonable person could believe that a covered entity" is violating the 340B statute through duplication or diversion. 61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996). A manufacturer can demonstrate reasonable cause with evidence such as "significant changes in quantities of specific drugs ordered by a covered entity and complaints from patients/other manufacturers about activities of a covered entity." *Id*. at 65,406. Additionally, the Agency does not need to "approve" the audit workplan for a manufacturer to conduct an audit. *Id.* The Agency simply reviews the plan to ensure that audit work performed is "relevant to the audit objectives while protecting patient confidentiality and information of the covered entity which is considered proprietary." *Id*. If, based on the manufacturers' submission, the Agency finds reasonable cause to believe that a violation is occurring, the Agency "will not in intervene" with the Audit. *Id*. at 65,410. Plaintiffs argue that covered entities have resisted cooperating with the audits, but the Agency has advised these covered entities to cooperate with the audits and has defended this position in lawsuits from various covered entities challenging the

audits.  *See e.g., University of Wash. Med. Ctr. v. Kennedy,* Civ. A. No. 24-2998 (RC) (D.D.C.)*; Oregon Health & Sci. Univ. v. Engels*, Civ. A. No. 24-2184 (RC) (D.D.C.)*; Children's Nat'l Med. Ctr. v. Engels*, Civ. A. No. 24-2563 (RC) (D.D.C.).

Further, Bristol Myers and Novartis's claims that rebates are the only way for them to guard against covered entities obtaining duplicative discounts through both the 340B Program and the Medicare Drug Price Negotiation Program ("the Negotiation Program") are inaccurate.  Plaintiffs can collect data that they need on the 340B status of prescriptions through other means.  As Intervenor 340B Health notes, many manufacturers already "require 340B Hospitals to collect and report data to a vendor employed by the relevant manufacturer."  340B Health Br. at 23 (Civ. A. No. 24-3337, ECF No. 39-1).  For example, Oregon Medicaid maintains a database where covered entities submit Medicaid rebate claims and identify dispensed 340B drug units.  State and Regional Hosp. Assn' Br. at 30 (Civ. A. No. 24-3337, ECF No. 43).  The rebate vendor uses this data to remove 340B claims from the claims that are identified as Medicaid rebate eligible and subtracts the 340B claims from the Medicaid rebate invoices that the State submits to the manufacturers.  *Id*.  Plaintiffs make no arguments explaining why these existing data collection regimes are not sufficient for them to track 340B prescriptions to track duplication and diversion.  On the contrary, Novartis maintains that it can impose data-reporting conditions on covered entities.  Novartis Mot. at 17 (ECF No. 12-1).  If Novartis can impose data-reporting conditions on covered entities, then Novartis's argument that it cannot access claims data that would allow it to link a particular prescription to both a 340B claim and a Negotiation Program claim without a rebate system collapses.

Various Intervenors and Amici propose other alternatives to the rebate model that would address Plaintiffs' concerns about duplication of 340B and Negotiation Program Discounts.  For

example, 340B Health has proposed that covered entities and manufacturers enter data sharing arrangements for 340B drugs that are dispensed to Medicare beneficiaries to ensure that providers will receive either the 340B discount or, if it is lower, the maximum fair price under the Negotiation Program, but not both.  340B Health Br. at 44-45.  This proposal from 340B Health, which would not involve a rebate for 340B purchases, is consistent with guidance from the Centers for Medicare & Medicaid Services ("CMS") which encouraged manufacturers to use "data available from covered entities and their 340B [third party administrators], and other prescription drug supply chain stakeholders" to ensure that the covered entity received the lesser of the 340B price or the Negotiation Program price.  CMS, Medicare Drug Price Negotiation Program: Final Guidance, at 232 (Oct. 2, 2024).  As another solution, Amicus State and Regional Hospital Associations have proposed a variation of the product replenishment model.  State and Regional Hosp. Assn' Br. at 27-28.  Under this proposal, Covered entities would only be able to purchase a replenishment stock on a given drug through a 340B account or a Negotiation Program account thus making it impossible for the covered entities to obtain a discount on the same unit of a given drug through both programs.  *Id.*

Accordingly, because Plaintiffs have other means available to prevent duplication and diversion, including any duplication and diversion that could occur between the 340B Program and the Negotiation Program, Plaintiffs' arguments that their rebate models are the only way for them to prevent duplication and diversion lack merit.

### C.    Plaintiffs Did Not Allow the Agency Sufficient Time to Consider the Effects of a Major Disruption to the 340B Program.

Plaintiffs disregard the significance of the Medicare Drug Price Negotiation Program being administered by the CMS.  Opp'n at 25-26.  But the fact that Plaintiffs proposed rebate models impinge on another Department component's equities further militates in favor of finding that the

Agency appropriately declined to allow Plaintiffs to proceed with the rebate models "at this time." AR 292, 347, 439.  That said, CMS is aware of the intersection of the two programs and has agreed to "coordinate with HRSA to provide and share information to support compliance with each agency's respective program requirements."  CMS, Negotiation Program Guidance, at 232.  This process is ongoing.  Importantly, manufacturers do not need to begin offering the maximum fair price on the first ten drugs subject to the Negotiation Program until January 1, 2026, giving CMS and HRSA additional time to issue additional guidance if needed.  Medicare Drug Price Negotiation Program: Selected Drugs for Initial Price Applicability Year 2027 (Jan. 2025), https://www.cms.gov/files/document/factsheet-medicare-negotiation-selected-drug-list-ipay-2027.pdf (last visited Apr. 15, 2025).

Finally, Plaintiffs dismiss the Agency's arguments that it has not had a sufficient opportunity to conduct a thorough review of the rebate models to ensure that the models will not undermine the 340B program or adversely affect covered entities or the patients that they serve. Opp'n at 26.  Drug manufacturers did not begin pitching widespread use of rebate models to the Agency until June 2024.  AR 049, 507.  When these manufacturers did not obtain instant approval from the agency, they bypassed the Agency and filed lawsuits beginning with Johnson & Johnson on November 12, 2024.  See *Johnson & Johnson Health Care Systems Inc. v. Kennedy*, Civ. A. No. 24-3188 (RC) (D.D.C.).  The Agency has notified manufacturers that if they proceed with implementing the rebate models at this time, then the Agency would initiate enforcement action. See e.g., AR 214.

The Agency does not dispute that these letters are a final agency action reviewable under the Administrative Procedures Act,  5 U.S.C. § 704, but the Agency did not issue the letters because it had conducted a thorough review of the proposed rebate models, rather the Agency issued the

letters because some of the manufacturers, including Bristol Myers and Novartis demanded that the Agency "acknowledge in writing" by a date certain that manufacturers have the right to implement the proposed rebate models. AR 317, 427. The Agency issued the letters prevent Plaintiffs from unilaterally implementing the rebate models before the Agency could fully review the proposals. AR 292, 347, 439. Even as it issued these letters, the Agency has not ruled out providing for rebate models if given sufficient time to assess the rebate models. AR 347 ("to date, the Secretary has neither approved or disapproved [the] rebate model").

Although many of the manufacturers now prefer rebate models, the covered entities prefer upfront discounts. See AR 635-39. Because the Agency has not yet fully considered "all aspects of the problem" *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co*., 463 U.S. 29, 43 (1983), the Agency justifiably declined to approve the rebate models in order to preserve the 340B program as it has operated since 1992.

## III.    **Bristol Myers and Novartis's Due Process Claims Lack Merit.**

At bottom, Bristol Myers and Novartis claim that the Agency's decision not to approve their rebate models deprives them of a property interest in not having to give duplicative discounts. Opp'n at 30. Constitutionally protected property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, (1972). Thus, to establish a property interest, Bristol Myers and Novartis must identify a "source of law creating [an] entitlement that qualifies as property under the Due Process Clause." *Roth v. King*, 449 F.3d 1272, 1285 (D.C. Cir. 2006). Although Bristol Myers and Novartis may have a property interest in not needing to acquiesce to diversion and duplication, they do not have a property interest in implementing their preferred method to curb duplication and diversion and thus their substantive and procedural due process claims fail.

A.    **Plaintiffs' Have Not Identified a Constitutionally Protected Property Interest in Implementing Their Preferred Price Reduction Mechanism.**

Bristol Myers and Novartis claim that duplication and other improper 340B claims are erroneous deprivations of Bristol Myers and Novartis's property and that the Agency's position is preventing manufacturers from curbing this abuse. Opp'n at 30. But by not allowing Plaintiffs to unilaterally implement rebate models, the Agency is not depriving these two manufacturers of a property interest. Duplication and diversion are unlawful under the 340B statute, 42 U.S.C. § 256b(a)(5)(A), and both the Agency and manufacturers can ensure that covered entities are not engaging in duplication and diversion through audits. *Id.*, § 256b(a)(5)(A). If the audits turn up evidence that covered entities are engaging in duplication or diversion, then the Agency can take enforcement action against a covered entity which can include compensating the manufacturer for unlawfully obtained discounts, 42 U.S.C. § 256b(a)(5)(D), (d)(2)(B)(v)(I), or, in some circumstances, a covered entity's removal from the 340B Program. *Id.* § 256b(d)(2)(B)(v)(II).

The Agency is not claiming that Bristol Myers and Novartis should accept duplication and diversion as the cost of doing business, but the Agency also does not need to accept these two manufacturers' representations that the rebate models are the only way for Plaintiffs to prevent duplication and diversion. AR 347, 439. Their due process arguments are based on the false premise that they do not have alternatives to the rebate models. Opp'n at 37-38. As explained in part II(b) above, Bristol Myers and Novartis could monitor sales for duplication or diversion using other methods such as requiring covered entities to submit certain data with their claims or replenishing 340B drugs separately from Negotiation Program drugs. As 340B Health proposed, manufacturers can obtain the data that they need to monitor transactions for duplication and diversion without implementing a rebate system. 340B Health Br. at 45-46.

Even if Bristol Myers and Novartis have a property interest in the drugs that they sell and in not needing to give both 340B and other discounts on the same unit of drug, they do not have a property interest in being able to prevent duplication and diversion through rebates especially since there are other methods to, in their words, "stop the bleeding from unlawful price reductions." Opp'n at 33. To show a constitutionally protected interest Bristol Myers and Novartis must identify "'explicitly mandatory language,' i.e., specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 462-63 (1989). In administering the 340B Program the Secretary has discretion to provide for rebates or discounts, 42 U.S.C. § 256b(a)(5), and "when a statute leaves a benefit to the discretion of a government official, no protected property interest in that benefit can arise." *Bloch v. Powell*, 348 F.3d 1060, 1069 (D.C. Cir. 2003).

Moreover, as Defendants explained, Def. Mot. at 34, because "there is no constitutional right (or requirement) to engage in business with the government, the consequences of that participation cannot be considered a constitutional violation." *Dayton Area Chamber of Commerce v. Becerra*, 696 F. Supp. 3d 440, 467 (S.D. Ohio 2024). Plaintiffs attempt to circumvent this argument by describing the financial consequences that would come from withdrawing from the 340B Program. Opp'n at 34. But these arguments contradict rulings from Courts around the country rejecting due process challenges to the operation of various federal drug pricing programs because, despite the significant financial incentives to participate, a manufacturer's decision to participate in programs such as the 340B Program, Medicare Part B, Medicate Part D, and Medicaid is voluntary. *See e.g. Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Public Welfare*, 742 F.2d 442 (8th Cir. 1984) ("Despite the financial inducement to participate in Medicaid, a nursing home's decision to do so is nonetheless voluntary"); *Boehringer Ingelheim*

*Pharms., Inc. v. Dep't of Health and Human Serv*., Civ. A. No. 23-1103, 2024 U.S. Dist. LEXIS 117413, *21 (D. Conn. Jul. 3, 2024) ("because BI can opt out of Medicare and Medicaid, it has not been deprived of property for the purposes of its Due Process Clause and Takings Clause claims"); *Eli Lilly & Co. v. Dep't of Health and Human Serv*., Civ. A. No. 21-0081, 2021 U.S. Dist. LEXIS 209257, at *67 (S.D. Ind. Oct. 29, 2021) (rejecting Fifth Amendment challenge to Agency decision preventing manufacturers from restricting 340B shipments to certain pharmacies because the manufacture has "voluntarily chosen to participate in the 340B program."). Thus, a manufacturer does not have a constitutionally protected interest in the operation of the 340B Program because manufacturer that is dissatisfied with the program has the option to withdraw.

In a seeming attempt to persuade the Court to ignore these precedents, Bristol Myers and Novartis analogize their case to *Valancourt Books, LLC v. Garland*, 82 F.4th 1222 (D.C. Cir. 2023). *See* Opp'n at 34-35. *Valancourt Books,* 82 F.4th, at 1226, involved a due process challenge to a statute requiring the owner of a copyrighted work to "deposit two copies of the work with the Library of Congress within three months of its publication." The D.C. Circuit found that this statute was an unconstitutional taking in violation of the Fifth Amendment. *Id*. at 1236. Specifically, the Circuit did not accept the Government's argument that the plaintiff was receiving the benefit of copyright protection in exchange for making a mandatory deposit because "[c]opyright 'subsists' as soon as one 'fixe[s]' a work 'in any tangible medium.'" *Id*. at 1236 (quoting 17 U.S.C. § 407(a)). In other words, the plaintiff had copyright protection regardless of whether it made the deposit. *Valancourt Books,* 82 F.4th, at 1236. Unlike in *Valancourt Books,* the Agency is providing Bristol Myers and Novartis a benefit in exchange for their willingness to provide 340B price concessions on terms provided by the Secretary: coverage of their products under Medicaid and Medicare Part B. 42 U.S.C. §§ 256b(a), 1396r-8(a)(1).

In short, because Bristol Myers and Novartis can prevent diversion and duplication through other means and Plaintiffs are not required to participate in the 340B Program, the Agency's decision to prevent them from implementing rebate models at this time does not deprive Plaintiffs of a constitutionally protected property interest.

### B.    Novartis Had an Opportunity to Be Heard But Chose Not to Pursue It.

In addition to identifying a constitutionally protected liberty or property interest a plaintiff alleging a denial of procedural due process must identify what process was due but denied. *Doe by Fein v. District of Columbia*, 93 F.3d 861, 869-70 (D.C. Cir. 1996). Only "after finding the deprivation of a protected interest does the Court look to see if the government's procedures comport with due process." *Chamness v. McHugh*, 814 F. Supp. 2d 7, 16 (D.D.C. 2011). Because Novartis failed to identify a Constitutionally protected liberty or property interest, the Court need not resolve whether the available process was sufficient. But even if Novartis had identified a constitutionally protected liberty or property interest, its due process claim fails because it has not explained what process it was due but denied. Opp'n at 39.

Novartis claims it is seeking "a mechanism for informing [the Agency] that covered entities have received 340B pricing they were not entitled to, and a robust way of holding such entities accountable" and that the rebate model would accomplish that goal. Opp'n at 39. In advancing this argument, Novartis collapses the elements of a due process claim arguing that because the Agency prevented them from implementing what they perceived was the best solution to guarding against duplication and diversion, the Agency deprived them of the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Kelley v. District of Columbia*, 893 F. Supp. 2d 115, 123–24 (D.D.C. 2012) (*citing Mathews*, 424 U.S. at 333). The Agency agrees that Plaintiffs do not need to acquiesce to duplication and diversion, but as already explained,

Novartis can monitor transactions for duplication and diversion through methods other than a rebate model.

Novartis appears to argue that the rebate model is the process that they are entitled to before they can be deprived of their constitutionally protected interest in not being subject to duplication or diversion. Opp'n at 39. Importantly, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Here, because Plaintiffs have alternative ways to monitor for duplication and diversion, the Court need not find that the rebate model is necessary to afford Novartis the right to be heard. *Lujan v. G & G Fire Sprinklers*, 532 U.S. 189, 197 (2001) (holding that a pre-deprivation hearing is not necessary for a State to afford adequate due process to a contractor before the state withholds payments because "the ordinary judicial process" for resolving contractual disputes is available as an alternative.)

The Agency was willing to collaborate with Novartis to develop a solution that would help Novartis prevent duplication and diversion, but Novartis resorted to litigation the day after the Agency informed them that they could not implement the rebate model "at this time." AR 439. Accordingly, Novartis's procedural due process claim fails because they failed to identify a process that they were due or denied.

*    *    *

## CONCLUSION

For these reasons and the reasons stated in Defendants' cross motion for summary judgment, the Court should grant summary judgment in Defendants' favor and deny Plaintiffs' motions for summary judgment.

Dated: April 18, 2025

Respectfully submitted,

EDWARD R. MARTIN, JR., D.C. Bar #481866
United States Attorney

By: _____/s/ John J. Bardo_____
    JOHN J. BARDO, D.C. Bar #1655534
    Assistant United States Attorney
    601 D Street, NW
    Washington, DC 20530
    (202) 870-6770

*Attorneys for the United States of America*